UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LBT IP II LLC,<br><br>      Plaintiff,<br><br>    v.<br><br>UBER TECHNOLOGIES INC.,<br><br>      Defendant. | Case No.  22-cv-03985-RFL<br><br>**ORDER DENYING MOTION FOR JUDGMENT ON THE PLEADINGS AND CONSTRUING CLAIMS**<br><br>Re: Dkt. Nos. 137, 139 |

Two patents remain at issue in this infringement action:  the '724 Patent and the '355 Patent.  Broadly, the '724 Patent describes a method for locating a tracking device using a series of transmitter/receiver station signals in addition to GPS signals, in situations where the tracking device does not have a line-of-sight (or a direct line-of-sight) to the GPS satellite.  The '355 Patent describes a method for providing a user interface that displays location information that may be drawn from multiple mapping providers without reaccessing those providers' websites, thus avoiding common issues of low bandwidth or spotty availability.  Uber moved for judgment on the pleadings, and the parties subsequently appeared for a joint hearing on Uber's motion and claim construction.  For the reasons set forth below, the motion is **DENIED**, and the below constructions of the disputed claim terms are adopted.  This Order assumes that the reader is familiar with the facts of the case, the applicable legal standards, and the parties' arguments.[1]

## I.    MOTION FOR JUDGMENT ON THE PLEADINGS

Uber moves for judgment on the pleadings on the basis that Claim 13 of the '724 Patent

---

[1] All citations to page numbers in filings on the docket refer to ECF page numbers

and Claim 1 of the '355 Patent are directed at abstract ideas.[2] *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014).

**A.    '724 Patent, Claim 13**

Claim 13 of the '724 Patent reads as follows:

> A method for locating an individual or an object, comprising:
>
> > associating a tracking device with the individual or the object to be located;
> >
> > receiving a location request from a user;
> >
> > transmitting a signal from a monitoring station to the tracking device;
> >
> > activating a global positioning system circuit within the tracking device;
> >
> > communicating a reference signal to triangulate location information utilizing a first transmitter/receiver station and a second transmitter/receiver station;
> >
> > receiving a global positioning system signal, a first transmitter/receiver station signal, and a second transmitter/receiver station signal;
> >
> > calculating location data responsive to the global positioning system signal, the first transmitter/receiver station signal, the second transmitter/receiver station signal, and the reference signal without line-of-sight between a global positioning system satellite and the tracked device;
> >
> > calculating the location data of the tracking device resulting from a comparison of measurements from gps satellites to the tracking device, measurements of distances between two or more gps satellites, and measurements of relative orientations of the two or more gps satellites, the tracking device, and earth;
> >
> > transmitting the location data to the monitoring station to determine location of the tracking device; and

---

[2] LBT does not dispute that these claims are representative.

informing the user of the location of the tracking device. ('724 Patent at cols. 9:46-10:13.)  According to the specification, this method of location without GPS line-of-sight did not exist under prior art.  (*See id.* at cols. 1:37-48, 3:24-29); *see also Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021) ("We have approached the [*Alice*] Step 1 directed to inquiry by asking what the patent asserts to be the focus of the claimed advance over the prior art." (citation omitted)).

In evaluating whether Claim 13 is directed at an abstract idea, *Thales Visionix Inc. v. United States*, 850 F.3d 1343 (Fed. Cir. 2017), provides a helpful analogue.  The patent there involved a "system for tracking the motion of an object relative to a moving reference frame." *See id.* at 1344 (citation omitted).  "[C]onventional solutions for tracking inertial motion of an object on a moving platform were flawed because both object- and platform-based inertial sensors measured motion relative to earth, and the error-correcting sensors on the tracked object measured position relative to the moving platform[,] [and] [a]ttempting to fuse this data produced inconsistent position information when the moving platform accelerated or turned."  *Id.* at 1345 (citations omitted).  The patent in question did not follow the conventional approach and instead changed the subjects being measured by the object and platform sensors.  *See id.*  This resulted in several advantages over prior art including, among other things, increased accuracy. *See id.*  In holding that the claimed system and method of tracking were not directed at an abstract idea, the Federal Circuit explained as follows:

> [T]he claims are directed to systems and methods that use inertial sensors in a non-conventional manner to reduce errors in measuring the relative position and orientation of a moving object on a moving reference frame. . . .  [They involve] the application of physics [to] create an improved technique for measuring movement of an object on a moving platform [and are thus] . . . directed to a *new and useful technique for using sensors to more efficiently track an object on a moving platform*. . . .  The claims specify a *particular configuration* of inertial sensors and a *particular method* of using the raw data from the sensors in order to more accurately calculate the position and orientation of an object on a moving platform.

*Id.* at 1348-49 (emphasis added) (citations omitted).

*Thales* controls here.  Similar to the claims there, Claim 13 is directed at a specific method of location tracking based on a particular configuration of signals from transmitter/receiver stations and the tracking device when the tracking device lacks a line-of-sight to a GPS satellite.  The specification claims that this yields a "new and useful technique" (*id.* at 1349) of tracking in indoor locations or in outdoor locations obstructed by large structures.  (*See* '724 Patent at cols. 1:37-48, 3:24-29.)  Uber argues that the better analogy is to cases like *Geoscope Technologies Pte. v. Google LLC*, No. 2024-1003, 2025 WL 1276235 (Fed. Cir. May 2, 2025), *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018), and *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), because Claim 13 is "directed to the abstract idea of displaying a location derived from calculations performed on collected data."  (*See* Dkt. No. 139 at 12.)  But Claim 13 involves more than merely gathering data, using that data to perform calculations, and presenting the result.  Rather, as explained above, the claim discloses using measurements from a particular configuration of signals and components to improve the accuracy of tracking a device when it is out of the line-of-sight of a GPS satellite.  That is a non-abstract technological solution to a technological problem.  *See, e.g.*, *Constellation Designs, LLC v. LG Elecs. Inc.*, 174 F.4th 888, 905-06 (Fed. Cir. 2026) (claims were non-abstract when, to address "capacity constraints" in "constellations," they disclosed a constellation of "unequally spaced" overlapping "unique point locations").

That distinguishes this case from Uber's authorities.  The claims in *Geoscope* concerned locating mobile devices by "collecting, comparing, and reporting data using conventional components," and "the asserted claims . . . at most recite[d] abstract data manipulation."  *See* 2025 WL 1276235, at *2, *5.  These claims were "not directed to any specific improvement in computer technology or signal transmission and measurement functionality.  Instead, they rel[ied] on existing technology as a tool to measure and compare data[.]"  *See id.* at *5.  In *SAP America*, the claims concerned statistical analysis of investment data comprising "selecting certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis."  *See* 898 F.3d at 1167.  While this method purportedly improved upon

4

the risk/reward conclusions offered by conventional statistical analyses, "the focus of the claims [was] not a physical-realm improvement but an improvement in wholly abstract ideas—the selection and mathematical analysis of information, followed by reporting or display of the results." *See id.* at 1163-64, 1168.  And in *Electric Power*, claims concerning performance monitoring of electric power grids "focus[ed] . . . on collecting information, analyzing it, and displaying certain results of the collection and analysis" without offering any "specific improvement" over existing methods.  *See* 830 F.3d at 1351, 1353-54.

At oral argument, Uber also argued that the claim language describes the tracking method at such a high degree of generality that the claim is necessarily abstract (*e.g.*, no specific calculations given).  *Thales* forecloses this argument; the claim language there likewise described the motion tracking method at a high degree of generality, and that generality did not preclude the Federal Circuit from concluding that the claims were not directed at an abstract idea.  *See* 850 F.3d at 1345-46.

### B.    '355 Patent, Claim 1

Claim 1 of the '355 Patent reads as follows:

> A method to provide location information on a webpage for a user in a personalized user format comprising:
>
>> providing user access to a location management dashboard module in response to detection of a successful user logon, the location management dashboard module comprising a listing of one or more groups of tracking devices the user is capable of monitoring;
>>
>> providing a graphical mapping module comprising menu options in the personalized user format, the menu options comprising one or more tile mapping controls as part of a wizard menu enabling the user to reposition graphical mapping tiles for the one or more groups of tracking devices from multiple mapping service providers, the graphical mapping tiles initially requested by the user on at least one tracking device of the listing of one or more groups of tracking devices, whereby the user repositions the graphical mapping tiles received as part of the initial request without re-accessing the websites of the mapping service providers;

> providing an alert message associated with the at least one tracking device in response to detection of the successful user login;
>
> providing a request signal to obtain location coordinates of the at least one tracking device of the listing of one or more groups of tracking devices;
>
> providing by the at least one tracking device a first reply signal that comprises a first identification code to identify the at least one tracking device; and
>
> displaying the location coordinates of the at least one tracking device to the user in response to the request signal.

('355 Patent at col. 24:14-43.)  Through a graphical mapping module that provides a user interface to reposition graphical mapping tiles drawn from multiple mapping service providers without reaccessing the mapping providers' websites, the method allows "maintain[ing] substantially[] continuous contact with location coordinate information of a tracking device" and "efficiently utiliz[ing]" a user's bandwidth.  (*See id.* at cols. 15:47-67, 20:38-56.)  According to the specification, this method improved on the prior art by addressing bandwidth and responsiveness problems that occurred when the map was drawn from a single mapping provider.  (*See id.* at cols. 3:63-4:5.)

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc*, 880 F.3d 1356 (Fed. Cir. 2018), provides an instructive comparison.  There, the patents "disclose[d] improved display interfaces, particularly for electronic devices with small screens like mobile telephones," through the use of "application summary window[s]" that presented "a limited list of common functions and commonly accessed stored data which itself c[ould] be reached directly from the main menu listing some or all applications."  *See id.* at 1359.  "Although the generic idea of summarizing information certainly existed prior to the invention, these claims [were] directed to a particular manner of summarizing and presenting information in electronic devices."  *Id.* at 1362.  The requirements of this summary and presentation imposed "limitations [that] disclose[d] a specific manner of displaying a limited set of information to the user, rather than using conventional user

6

interface methods to display a generic index on a computer.  [Accordingly,] [l]ike the improved systems claimed in [prior cases, including *Thales*,] these claims recite a specific improvement over prior systems, resulting in an improved user interface for electronic devices." *See id.* at 1363.

Claim 1 of the '355 Patent is similar.  It discloses a particular manner of presenting information that may come from multiple mapping providers via graphical mapping tiles without reaccessing the providers' websites, which proves particularly advantageous in situations of limited bandwidth or spotty availability.  This is a technical solution to a technical problem.  As before, Uber argues that the claim is directed at the abstract idea of "providing and displaying 'location information' for an individual associated with a 'tracking device.'"  (*See* Dkt. No. 139 at 16.)  And as before, the claim is not as narrowly directed as Uber insists.  While Claim 1 does concern the display of information, it is directed at doing so in a manner that allows for greater technical efficiency than previously existed.

At oral argument, Uber attempted to distinguish *Core Wireless* on the basis that the claims there were directed at improved displays for devices with small screens, and any improvements presented by the '355 Patent were not disclosed in the language of Claim 1.  Yet even in *Core Wireless*, the claim language did not limit the invention to devices with small screens, though the specification discussed the inventive concept as involving an improvement over the prior art for small screens.  *See* 880 F.3d at 1359-60.  Though the patent eligibility determination assesses the invention as described in the claim language, "the specification may help illuminate the true focus of a claim" at *Alice* step one and describe why the claimed invention is an advance over the prior art.  *See Constellation Designs*, 174 F.4th at 901.

\* \* \*

In sum, the representative claims are not directed at abstract ideas.

## II.    CLAIM CONSTRUCTION

### A.    Term No. 1 ('724 Patent, Claims 8, 13)

| Term | Construction |
|---|---|
| "location request" | "request for the location pertaining to the aforementioned tracking device" |

LBT initially proposed that plain and ordinary meaning applies.  At oral argument, it did not dispute that declining to construe the term would result in a claim scope covering a situation where a location request returns the location of a tracking device other than the one referenced earlier in the claims.  Uber disputes that the claims cover requests for the location of anything other than the specific device referenced earlier in the claims (or the person or object associated with that device).  Because "the parties raise an actual dispute regarding the proper scope of these claims," construction beyond plain and ordinary meaning is necessary.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

As an alternative to plain and ordinary meaning, LBT agreed at oral argument that the above construction, with its use of "pertaining to," would be appropriate.  Uber responded that distinguishing between this construction and the construction it proposed in the briefing would present "a distinction without a difference."  Accordingly, the above construction is appropriate, as there does not appear to be a live dispute that it is accurate.

### B.    Term No. 2 ('724 Patent, Claims 8, 13)

| Term | Construction |
|---|---|
| "activating the tracking device" / "activating a global positioning system circuit within the tracking device" | "without action on the part of an individual or object to be tracked, placing a [tracking device] / [global positioning system circuit within a tracking device] in a state where signals can be received and transmitted" |

Uber argues that the claims encompass only a method of passive activation, *i.e.*, the activation step is satisfied without any action by the person being tracked.  LBT argues that the claims merely require that a tracking device be *capable* of passive activation but that they do not foreclose the possibility of the person being tracked themselves activating the device.

Uber has the better position.  The specification explains that "the system of the present

invention is passive, in that a user remotely activates the tracking device once the user begins an attempt to locate the tracking device for receiving and transmitting signals. No action is required on the behalf of an individual being located and tracked." ('724 Patent at col. 3:33-38.) This clear and unmistakable language limits the scope of the claims. *See Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016). In light of this unequivocal phrasing, it does not matter that this language does not expressly exclude certain characteristics. *See, e.g.*, *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 935-36 (Fed. Cir. 2013) (description of "present invention" as including multiple disks supports disclaimer of construction involving just one disk). Nor does it matter that this language appears in a section of the specification that begins by explaining that "[t]he following detailed description . . . is not to be taken in a limiting sense." ('724 Patent at col. 2:62-67.) "[S]uch boilerplate language, without more, is not sufficient to overcome the explicit description of the 'present invention[.]'" *SandBox Logistics LLC v. Proppant Express Invs. LLC*, 813 F. App'x 548, 553 n.8 (Fed. Cir. 2020) (citations omitted). Moreover, none of the embodiments in the specification describes anything other than passive activation. To the contrary, the specification identifies scenarios where it would be particularly advantageous for someone other than the person being tracked to be able to activate the tracking device (*e.g.*, abduction, person with Alzheimer's syndrome), and in the event an animal or object is being tracked, anything other than passive activation seems impossible. (*See* '724 Patent at col. 3:3-10.)

At oral argument, LBT expressed concern that the above construction would exclude from the claims a scenario where the person being tracked happens to activate the tracking device for some purpose unrelated to determining and transmitting the location of the device (*e.g.*, turning on a phone that has a tracking device in it several hours before a location request is issued), and the remote user then issues a location request and instructs the tracking device to activate without requiring any action from the tracked individual. The above construction does not exclude such a scenario from the claims, so long as the identified activation step (*i.e.*, placing the tracking device in a state where signals can be received and transmitted) does not involve any

9

action by the person being tracked.

Finally, because "activating" is a technical term, construction beyond plain and ordinary meaning is appropriate. *See Acacia Media Techs. Corp. v. New Destiny Internet Grp.*, 405 F. Supp. 2d 1127, 1132 (N.D. Cal. 2005) ("If a technical term is used in a patent claim, generally, the term should be interpreted as having the meaning a person experienced in the field of the invention would give to it." (citing *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116 (Fed. Cir. 2002))).  Once more, the "passive" language in the specification supports the above construction:

> Conventional systems often require an individual to *manually activate* a location system *before signals can be received and transmitted* between the individual and a person attempting to locate the individual.  However, the system of the present invention is passive, in that a user *remotely activates* the tracking device once the user begins an attempt to locate the tracking device *for receiving and transmitting signals*.  No action is required on the behalf of an individual being located and tracked.

('724 Patent at col. 3:30-38 (emphasis added).)[3]

### C.    Term No. 3 ('724 Patent, Claims 8, 13)

| Term | Construction |
|---|---|
| "[wherein a latitude and longitude of the tracking device results from / calculating the location data of the tracking device resulting from] a comparison of measurements from gps satellites to the tracking device, measurements of distances between two or more gps satellites, and measurements of relative orientations of the two or more gps satellites, the tracking device, and earth" | plain and ordinary meaning |

Uber requests construction of this term beyond plain and ordinary meaning to add two purported clarifications.  First, Uber seeks to require that the comparison of measurements occurs when the tracking device is without GPS line-of-sight, based on LBT's statements in the

---

[3] Because the "system" as a whole is passive, activation of the tracking device and activation of the GPS circuit in the tracking device both occur passively.  Thus, construction does not require resolution of the parties' dispute as to whether activating the tracking device constitutes activating the GPS circuit.

prosecution history.  LBT did not, however, propose limiting this term in that manner.  Rather, LBT stated as follows:  "Element [H][2] *must be read within the confines of the entire claim* wherein the system is 'without line-of-sight between a [GPS] satellite and the tracked device.  At best, Ito only shows the calculation required by Element 13[H][2] in an irrelevant situation (*i.e.*, in a situation where there is a clear line-of-sight between the GPS satellites and the object to be tracked)."  (Dkt. No. 137-5 at 25 (emphasis added) (citations omitted).)  That statement is best read as explaining that the Ito prior art discloses Element 13[H] only in a situation that is irrelevant because it would not satisfy the "without line-of-sight" requirement of Element 13[G].  As such, neither judicial estoppel nor a finding of disclaimer is appropriate here.

Second, Uber seeks to make explicit that the three sub-elements in the comparison "are used conjunctively."  (Dkt. No. 137 at 19.)  That addition would be redundant and unnecessary to resolve any ambiguity because the term already connects the three categories of measurements being compared using "and."

### D.    Term No. 4 ('355 Patent, Claim 1)

| Term | Construction |
|---|---|
| "graphical mapping tiles . . . from multiple mapping service providers" | plain and ordinary meaning |

Uber requests construction of this term beyond plain and ordinary meaning to limit the integration of data from multiple mapping service providers to a single embodiment:  One integrated map that incorporates mapping tiles from various providers.  Neither the claim language nor the specification suggests that the integration covered by the claim is limited to that single embodiment.

The claim broadly contemplates "providing a graphical mapping module" with controls "enabling the user to reposition graphical mapping tiles for the one or more groups of tracking devices from multiple mapping service providers."  (*See* '355 Patent at col. 24:21-27.)  The specification likewise describes an embodiment constituting a "module [that] advantageously switches between one or more sources of mapping service providers substantially seamlessly . . .

11

. As a consequence of the switching . . ., user advantageously receives tiles from one or more sources of mapping service providers in an efficient manner." (*See id.* at col. 15:10-17.) Nothing in this language limits the display of tiles to being presented in a single map. For example, a single tile could be displayed, and while the tile may switch between providers, thereby rendering the module one that integrates data from different providers, the single-tile display would not be an integrated map. Likewise, in a multi-tile display, if every tile in a particular instance is switched to come from a single provider, the map would not be an integrated map. Similarly, the module could display multiple separate maps, each one entirely based on data from a discrete service provider. Moreover, nothing in the prosecution history identified by Uber indicates that LBT limited integration to the single embodiment proposed by Uber. (*See* Dkt. No. 137 at 24-27.)

### E.    Term No. 5 ('355 Patent, Claim 1)

| Term | Construction |
|------|--------------|
| "alert message" | plain and ordinary meaning |

Uber's proposed construction would limit all alert messages to only those messages concerning "unusual or potentially dangerous situation[s]." (*See id.* at 27.) Certainly, an alert can include a warning of a "dangerous condition." (*See* '355 Patent at col. 11:28-34.) But the specification supports a broader construction that contemplates even relatively innocuous events triggering alerts. For example, one embodiment involves an alert "upon battery charge level falling below a specified level." (*See id.* at col. 11:44-47.) Alerts can also be prompted by "breach conditions," which can take the form of "violation[s] of a user defined system policy." (*See id.* at col. 11:50-54.) Nothing in the specification suggests that these user defined system policies are limited to situations where a violation would indicate the occurrence of an unusual or potentially dangerous situation.

It doesn't matter that LBT explained in IPR proceedings that "information updates" aren't alert messages. (*See* Dkt. No. 137 at 28.) Information updates do not encapsulate all innocuous messages such that anything that isn't an information update necessarily involves

some degree of unusual circumstances or danger.

The plain meaning of the term also does not support Uber's proposed construction. For example, a text message alert can notify a recipient of important information that does not concern unusual circumstances or danger.

### F.      Term No. 6 ('355 Patent, Claim 1)

| Term | Construction |
|---|---|
| "wizard menu" | "an interactive help utility within an application that guides the user through each step of a particular task" |

Although the parties agree that the term "wizard menu" is a term of art in the field of computer science, they disagree as to the term's meaning, so construction beyond the plain and ordinary meaning is required. *See O2 Micro*, 521 F.3d at 1360. The specification identifies Figures 2 and 12 as illustrating wizard menus. (*See* '355 Patent at cols. 9:40-61, 10:62-63.) Figure 2 accords with Uber's proposed construction because it shows a user interface that presents a sequence of prompts to accomplish a task. Figure 12, however, displays a single page rather than a "series of menu options." The Court tentatively adopted the above construction in advance of oral argument, which encompasses both Figures 2 and 12, and which it based on a dictionary definition submitted by Uber. (*See* Dkt. No. 137-16 (Microsoft Computer Dictionary) at 5.) At argument, LBT proposed as an alternative a substantially similar dictionary definition. It otherwise "generally [] agree[d]" with the proposed construction, and Uber raised no objection to the proposed construction. Accordingly, this Order adopts the above construction.

### G.      Term No. 7 ('724 Patent, Claim 13)

| Term | Construction |
|---|---|
| "reference signal to triangulate location information utilizing a first transmitter/receiver station and a second transmitter/receiver station" | not indefinite<br><br>construction of "reference signal": "a signal in which the first transmitter/receiver station signal and the second transmitter/receiver station signal share some common feature so that calculations can be done relative to the shared feature" |

Uber bears the burden of demonstrating that a term is indefinite. *See Apple, Inc. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 1141, 1153 (N.D. Cal. 2012) (citing *Young v. Lumenis, Inc.*, 492 F.3d 1336 (Fed. Cir. 2007)). LBT's expert, Jeffrey Miller, opined that "[a] POSITA would understand the 'reference signal' of the '724 Patent to be a signal in which all other signals share some common feature so that calculations can be done relative to the shared feature." (Dkt. No. 138-3 at ¶ 51.) Uber does not refute this. Instead, Uber's expert, Gerry Christensen, criticized LBT's expert for saying this definition would exclude signals in "EOTD" systems. (*See* Dkt. No. 137-21 ¶¶ 59-64.) Whether EOTD systems have the requisite common feature and thus are properly understood to fall within this definition, though, is a separate issue. Accordingly, Uber has not carried its burden to show that the term is indefinite.

*Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388 (Fed. Cir. 2016), and *Sonix Technology Co. v. Publications International, Ltd.*, 844 F.3d 1370 (Fed. Cir. 2017), do not compel a different conclusion. In both decisions, the Federal Circuit explained that definiteness concerns whether a POSITA would understand the meaning of the disputed term. *See Liberty*, 835 F.3d at 1395-96; *Sonix*, 844 F.3d at 1377. As explained above, Uber has failed to carry its burden that a POSITA would not understand what is meant by "reference signal."

Because "reference signal" is a technical term, construction beyond plain and ordinary meaning is appropriate. *See Acacia*, 405 F. Supp. 2d at 1132. The above construction does make a modification to Miller's definition to clarify an issue based on the claim language. "Reference signal" first appears in Element 13[E]: "communicating a reference signal to triangulate location information utilizing a first transmitter/receiver station and a second transmitter/receiver station." ('724 Patent at col. 9:55-57.) Thus, it appears that "all other signals" in Miller's definition refers to the signals provided by the first transmitter/receiver station and the second transmitter/receiver station. Indeed, "reference signal" appears only once more in the claim, in Element 13[G], and although that element refers to "calculating location data responsive to" a first transmitter/receiver station signal, a second transmitter/receiver station signal, a GPS signal, and the reference signal, that element does not say anything additional

14

about the content or purpose of the reference signal.

### H.    Term No. 8 ('724 Patent, Claims 8, 13)

| Term | Construction |
|---|---|
| "without direct line-of-sight between a global positioning system satellite and the tracked device" / "without line-of-sight between a global positioning system satellite and the tracked device" | not indefinite<br><br>construction of "with line-of-sight":  "no obstruction is present that would make GPS tracking difficult or impossible"<br><br>construction of "without line-of-sight":  "an obstruction is present that is sufficient to make GPS tracking difficult or impossible"<br><br>construction of "without direct line-of-sight": "an obstruction is present that affects GPS tracking but is insufficient to make GPS tracking difficult or impossible" |

The parties' experts disagree as to whether a POSITA would understand the meaning of "without line-of-sight."  Both experts agree, however, that line-of-sight obstructions can either partially or completely block GPS signals.  (*See* Dkt. Nos. 54-4 ¶ 26, 137-21 ¶ 65.)  This accords with the specification's discussion of line-of-sight obstructions:  "GPS technology . . . is generally limited to outdoor, line-of-sight uses.  Consequently, finding the location of an individual or an object is difficult, or impossible for an indoor location or a location that is obstructed by a large structure . . . ."  (*See* '724 Patent at col. 1:37-44.)  The parties also agree that the question is one of degree.  "[C]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention."  *Sonix*, 844 F.3d at 1377 (citation omitted).  Uber has not presented evidence that a POSITA would have difficulty understanding with sufficient certainty when obstructions would make GPS tracking difficult or impossible.  Accordingly, Uber has not carried its burden to show that the term is indefinite.

In light of the parties' disagreement and the importance of the specification in construing the terms, it is not appropriate to construe the terms solely according to their plain and ordinary meaning.  The above constructions clarify, based on the language of the specification, that there

exists a spectrum of line-of-sight obstructions, and in the middle of that spectrum lies the category of obstructions affecting GPS signaling but not to a degree that makes GPS tracking difficult or impossible.

At oral argument, LBT proposed revising the construction of "without direct line-of-sight" to remove "difficult": "an obstruction is present that affects GPS tracking but is insufficient to make GPS tracking ~~difficult or~~ impossible." The specification, however, lumps together situations where GPS tracking is difficult with those where it is impossible. The background section describes existing technology as limited to "outdoor, line-of sight uses" because GPS tracking for indoor or obstructed locations is "difficult, *or* impossible." ('724 Patent at col. 1:37-48 (emphasis added).) LBT identifies nothing in the specification or its expert declaration indicating a basis for disaggregating those concepts for purposes of understanding the terms "line-of-sight" or "direct line-of-sight." Accordingly, this Order adopts the above construction.

## I.    Term No. 9 ('724 Patent, Claim 13)

| Term | Construction |
|---|---|
| "transmitting the location data" | not indefinite<br><br>construction of "transmitting the location data": "transmitting the location data calculated in Element 13[G] and transmitting the location data calculated in Element 13[H]" |

Uber is concerned that Elements 13[G] and 13[H] each refer to the calculation of "location data," and so it is purportedly not clear whether the transmission of "location data" in Element 13[I] refers to one or both of these categories of calculated location data. Because Element 13[I] refers to "the" location data, and because "data" is a plural noun, a natural reading is that Element 13[I] refers to every instance of location data previously mentioned in Claim 13. There is no affirmative reason why Element 13[I] would refer to just one of the prior categories of calculated location data. Accordingly, Uber has not carried its burden to show that the term is indefinite.

At the same time, in light of the dispute about the term's reference to "the" location data, it does not seem appropriate to construe the term solely according to its plain and ordinary meaning. LBT implicitly proposes a construction in arguing that "[t]he data flow is sequential and cumulative," such that the calculated data in Element 13[G] feeds into the calculation step of Element 13[H], resulting in only the data calculated in Element 13[H] being transmitted in Element 13[I]. However, nothing in the claim language or specification discloses such a sequential combining of data between Elements 13[G] and 13[H]. That step also does not appear in Figure 4's flow.

The better construction comes from a natural reading of the claim language, as discussed above. This reading is supported by LBT's expert declaration: "[T]he POSITA would understand that the claimed method can include transmitting data from more than one source to determine the location of the person or object." (Dkt. No. 54-4 ¶ 29.)

**IT IS SO ORDERED.**

Dated: June 26, 2026

_____
RITA F. LIN
United States District Judge

17